# City Court.

General Term—October, 1884.

## BARBARA POSER *against* GUSTAV KAHRS.

Breach of promise to marry. Damages. The plaintiff, a widow, forty six years of age, who had buried two husbands, sued the defendant, who was her junior in years, for breach of promise to marry. There was no allegation of seduction, and no proof that the defendant owned any property or had any wealth. *Held,* that under such circumstances, it could not be claimed that the plaintiff's prospects were blighted, her fond hopes crushed, or her proud spirit broken. Her age and condition would indicate that she had arrived at that time of life when disappointment becomes the rule rather than the exception ; and that a verdict for $2,500 was excessive.

Appeal from judgment entered on verdict in favor of the plaintiff for $2,500 damages for the breach of a promise to marry, and from an order denying a motion made for a new trial.

*John Hardy,* for defendant and appellant.

*F. J. Dupignac,* for plaintiff and respondent.

By the Court.—McAdam, Ch. J., and Hyatt, J.—The plaintiff is a widow, having buried two husbands before she formed the acquaintance of the defendant, and the latter a widower, having buried his wife before he formed the plaintiffs' acquaintance. They did not not meet in the usual way, for the plaintiff describes the manner of their acquaintance as follows :

" Q. State when and how you became acquainted with the defendant?

" A. Mrs. Buckholz came up stairs to me and asked me

Poser *v.* Kahrs.

to come down, there was a gentleman wanted to see me, and so I went with her, and when we went down she made me acquainted with the defendant.

" Q. Who is Mrs. Buckholz?

" A. The lady who keeps the saloon down stairs.

" Q. German lager-beer saloon?

" A. Yes, sir.

" Q. You were introduced to Mr. Kahrs?

" A. Yes, sir ; and then we were talking at night together about family affairs. That was all for that night, and then I went up stairs.

" Q. After you had been introduced to Mr. Kahrs when did you next see him?

" A. I guess a couple of days after.

" Q. Where?

" A. In the same place again.

" Q. State what took place between you and him then?

" A. The same talk over again ; we did not have much to say.

" Q. About your family and his family?

" A. Yes, sir.

" Q. When did you see him next?

" A. Most every day. He came every day in the place, and when he was in he always wanted me down; he sent up for me to come down.

" Q. And you went down and spoke to him?

" A. Yes, sir.

" Q. When first, if at all, was the subject of marriage spoken of?

" A. About three or four months after the introduction.

" Q. State where it was?

" A. He went outside with me and asked me whether I wanted to be his wife.

" Q. What did you say?

" A. I said, I don't know, Mr. Kahrs ; I am afraid I am too old for you, and I am too poor, and there are so many young women after you ; and I thought he could have a

Poser v. Kahrs.

younger woman than me. I did not say yes. I did not think he meant it at the same time.

"Q. When was the next conversation you had after that?

"A. It was right after that again. He came every day, and wanted to see me every day. He said he had a daughter and she was kinder sickly, and, he said he wanted to get married because he must have help in the house; he did not want to be alone with the girl; his daughter wanted help.

"Q. What answer did you give him to that?

"A. I had a step-daughter, and I thought the two daughters would not agree very well, and I said I wanted to wait a little longer because my daughter might get married, she was having company, or his daughter might get married after she got well again. I did not want to get married at that time. I was always afraid that the man was too rich.

"Q. When did you next have a conversation with him?

"A. Well, I don't know that exactly. We always had the same conversation.

"Q. Day after day?

"A. Day after day."

This is substantially the courtship as described by the plaintiff. The defendant finally refused to marry the plaintiff, and she brought the present action to recover damages for the breach. She subsequently testified to a mutual promise and breach. The jury awarded her $2,500, and the main question before us is whether it is excessive, or about right.

The plaintiff in her evidence has referred to the defendant as a "rich" man; but there is nothing in the case proving his wealth or social position, from which we can tell in dollars and cents what the plaintiff has lost by the breaking off of the contemplated match. Seduction is not alleged in the complaint, and was not proved upon the

Poser *v.* Kahrs.

trial, so that element of damage cannot be considered or compensated for.

Sedgwick, in his work on Damages (6 ed. p. 248), says : " To the general rule another exception also exists, that of breach of promise of marriage.   In this action, though in form *ex contractu,* yet it being impossible from the nature of the case to fix any rule or measure of damages, the jury are allowed to take into consideration *all the circumstances,* and, provided their conduct is not marked by prejudice, passion or corruption, they are permitted to exercise an absolute discretion over the amount of compensation."

The court upon appeal, however, must determine whether their discretion has been exercised in a judicial manner.   In reviewing the question of damages due regard must be had to the social status of the parties— their condition in life, and these are to be considered n the light of the facts and the surrounding circumstances.

The plaintiff is forty-six years of age, and, as before remarked, has buried two husbands.   The age of the defendant does not appear, although the plaintiff testifies that on the occasion when marriage was first suggested, she said to the defendant, "Mr. Kahrs, I am afraid I am too old for you."

From this we infer that the defendant is not the senior of the plaintiff, but her junior.   No preparations were made for the wedding, no engagement party had been celebrated ; in fact, no day was fixed for the nuptials.  When marriage was suggested, the plaintiff testifies, "I did not think he meant it."  Perhaps he did not.  The defendant's conduct leads to the inference that he did not.

Under such circumstances, it can hardly be claimed that the plaintiff's prospects were blighted, her fond hopes crushed and her proud spirit humiliated or broken.   Her age and condition would indicate that she had arrived at that time of life, when disappointment becomes the rule rather than the exception.   When marriage becomes a matter of interest rather than the spontaneous outburst

of love,—for it is hard to believe that nature keeps alive in the breast of the widow, who has buried two husbands, that warmth of affection and ardor peculiar to youthful hearts,—nor can we believe that the plaintiff, already bowed down with grief at the loss of two husbands, is at the age of forty-six heartbroken at the mere loss of an opportunity of getting another. Nature has not so ordained, and we are to look upon the facts as they are, and must consider the age and condition in life of the parties, without indulging in sentimental imaginations and fancy.

It does not follow, however, that the defendant had the right to promise to marry the plaintiff, and then jilt her because of these facts. He has broken his promise, and must pay the legitimate damages resulting from the breach; and the question to be determined is, what loss has the plaintiff (all things considered) fairly suffered from it?

The jury in their discretion have fixed the amount at $2,500. In some cases this would not be enough. In others too much. Verdicts for larger amounts have been sustained, but there were circumstances which justified the recoveries had. Without imputing to the jury either prejudice, passion or corruption, we think they have allowed their sympathies for the widow to work on their liberality, and have under the circumstances allowed too much. Our experience is that juries in other cases of like character have fixed damages at a much lower figure. We think the judgment ought to be reversed, and a new trial ordered, with costs to abide the event, to the end that the damages may be assessed by another jury. If, however, the plaintiff within ten days elects to reduce the recovery to about one-third of the amount allowed,—say to $800,—the judgment, as modified, will be affirmed, with the costs below, but without the costs of this appeal; the effect of which will be to mulct the defendant in about $1,000, which is ample punishment for his indiscretion on

the one hand and ample compensation for the plaintiff's grievance on the other.

The plaintiff consented to the reduction, and the judgment as reduced was paid.